## WALLERTON *v.* SNOW and others.

*(Circuit Court, D. Kansas.* November 28, 1882.)

1. **EQUITY—PRE-EMPTION—GOVERNMENT PATENTS.**

    By joint resolution of April 10, 1869, congress provided that a *bona fide* settler upon certain lands known as the "Osage ceded lands," in Kansas, should have a right to purchase on certain terms. The defendant, Snow, was such a settler, and, having the right to purchase under said joint resolution, he made the requisite proof and tender of the purchase money to complete such purchase. *Held,* that he was entitled to a patent from government, and has an equity in the land and improvements thereon which he is at liberty to sell and convey.

2. **SAME—LOCAL LAND-OFFICER.**

    The refusal of a local land-officer to receive the purchase money, on the ground that it was too late to give notice to others who were supposed to have an adverse claim, will not defeat such settler's rights.

3. **SAME—RIGHTS OF SUBSEQUENT PURCHASERS.**

    Where one holding an equitable title as above conveys that equity and gives up possession to another, who agrees to pay therefor when the grantor's equity shall have ripened into a legal title, such purchaser will not be allowed to make use of the possession so obtained to perfect a title in himself, and thus release himself from his liability to the party whose equity he has so purchased; and subsequent purchasers of land so acquired take whatever rights they have in the land, subject to the rights of the party in whom the equity thereto was first vested.

In Equity. On demurrer to bill.

The material allegations of the bill are, in substance, as follows:

(1) On the twenty-ninth day of August, 1876, one Stephen Hardin filed his declaratory statement in the proper local land-office for pre-emption upon the quarter sections of land now in controversy, and on the twenty-second of December following he made proof and payment, under the act of congress of August 11, 1876, (19 St. 127,) and obtained the usual certificate and receipt.

(2) Subsequently, on the first day of June, 1877, the said Hardin and his wife, being then in possession of the land, executed to complainant a mortgage to secure the sum of $1,000.

(3) Default having been made on the payment of said debt, suit was brought to foreclose the same, to which suit defendant Snow was made a party, but as to him the suit was dismissed, and decree of foreclosure, with the usual order of sale, was taken against the other defendants. At the sale under said decree the land was purchased by one Noble for complainant, to whom he subsequently made conveyance; but when possession under the master's deed was demanded, it was refused, the said Hardin having yielded possession to one Sherrill, who claimed to hold under defendant Snow.

(4) At the time of the foreclosure suit, the defendant Snow held a patent from the United States for the land in controversy. The complainant claims,

however, that this patent was obtained in violation of his rights and against good conscience, and he seeks a decree that it be held in trust for him.

(5) The facts with respect to Snow's title are as follows, as appears by the bill: The land in controversy is a part of what is known as the "Osage ceded lands," in Kansas. By joint resolution of April 10, 1869, congress provided that any *bona fide* settlers upon any of said lands should have the right to purchase on certain terms; and Snow was such a settler, having entered upon the land and bought the improvements belonging to an earlier settler in 1870. Having the right to purchase under said joint resolution, Snow made the requisite proof, and tendered the purchase money to complete such purchase; but the local land-officers refused to execute to him the proper receipt and certificate, for what reason does not appear by the bill, but it is said in argument that it was because there was not time in which to notify certain railroad companies then supposed to have some adverse interest in the land. Snow continued to occupy the premises until 1875, when he made a conditional sale of the same to one Samuel Sherrill for $4,150, giving bond for a deed when his title should be perfected, and Sherrill should pay the purchase price, represented by four promissory notes due at different dates, only one of which has been paid. In pursuance of this contract, Snow yielded possession to Sherrill, who, on the seventh of April, 1875, sold and conveyed such equities as he had to Hardin. Having thus obtained possession, Hardin proceeded, as above stated, to obtain title under the act of 1876, which, like the joint resolution of 1869, authorized sales of said lands under certain terms and conditions to *bona fide* settlers. The right of Hardin to purchase was contested by Snow, and, as a result of that contest, Hardin's entry was set aside and Snow was allowed to make proof of entry as of his first settlement, and thereupon he completed his entry and received his patent.

*Rossington, Johnston & Smith,* for complainant.

*Hutchings & Denison* and *L. Stillwell,* for defendants.

McCRARY, J. Snow was, prior to his sale to Sherrill, the defendant in possession of the land, owning valuable improvements thereon, and having done all that the law required to enable him to obtain the title. He had made the necessary proof and tendered the purchase money as required by the joint resolution of congress of April 10, 1869. He was undoubtedly a *bona fide* settler, and had an equity in the land. The adverse decision of the local land-officers was, clearly, not fatal to the claim. It could be attacked in the courts or before the land department of the government in a new proceeding to test his rights. *Harkness* v. *Underhill,* 1 Black, 319, and cases cited. And even if conclusive of his rights under the joint resolution of 1869, it would not have deprived him of the benefit of other laws intended for the protection of *bona fide* settlers upon the public lands. This adverse ruling was, however, set aside by a later ruling of the commissioner of the general land-office and the secretary of

the interior, by which a patent was awarded to Snow. That this last action of the land department was in accordance with the law, as between the United States and Snow, is, we think, entirely clear. The ruling of the local land-officers rejecting Snow's application to purchase, on the ground that it was then too late to give notice to certain railroad companies who were supposed to have an adverse interest, cannot be upheld upon any sound construction of the joint resolution of 1869; and unless, prior to the order granting a patent to Snow, Hardin had acquired a vested right in the lands which entitled him to a patent, the complainant cannot recover. We are, therefore, to consider whether Hardin acquired such a vested right in the *interim* between the rejection by the local officers of Snow's application to purchase, and the decision of the department at Washington awarding him the patent. It appears that while yet in possession, owning the improvements and possessing the equities to which we have referred, Snow made a conditional sale of the premises to one Samuel Sherrill for $4,150, giving him a bond for a deed to be executed when Snow should complete his title to the land, and Sherrill should pay the purchase money, which he was to do in installments due January 1, 1876, January 1, 1877, January 1, 1878, and January 1, 1879, with interest. The bond was to be void if the notes were not paid. Only the first installment has been paid.

The court is of the opinion, independently of all other questions in this case, that Snow had an equity in the land, and improvements which he was at liberty to sell and convey to Sherrill, and that he was at liberty to secure the purchase money by the execution of a bond for a deed. This contract was perfectly valid as between Snow and Sherrill, and all other persons chargeable with actual or constructive notice of the rights of Snow under it. It is not alleged in the bill that Hardin, under whom, through a mortgage foreclosure, the complainant claims, was without notice of the rights of Snow under the bond above named. On the contrary, it is averred that Hardin, before attempting to procure a patent, purchased the claim and improvements from Sherrill, and notice of the contract between Sherrell and Snow is *impliedly* admitted by the allegation of the bill that "on the twenty-third day of January, 1875, the said Snow entered into a contract with the said Sherrill, whereby the said Sherrill became seized and possessed of said premises and the improvements thereon." Besides, if it be true, as stated by counsel in argument, that Sherrill conveyed to Hardin by quitclaim deed then, it follows that

the latter cannot be regarded as a *bona fide* purchaser without notice. *May* v. *LeClaire*, 11 Wall. 217.

We conclude, therefore, that Hardin acquired whatever rights he had in the land, subject to the rights of Snow, under the bond executed by him to Sherrill. He simply took the place of Sherrill, and it required no argument to show that if Sherrill, instead of selling to Hardin, had gone on and applied for a patent under the act of 1876, whatever title he might have acquired would have been held by him subject to his liability to Snow. Snow had an equity in the land for which Sherrill agreed to pay him a given sum as soon as the equity should ripen into a legal title. By virtue of the contract between them, Sherrill obtained possession from Snow. It would be grossly inequitable to permit him to use that possession to perfect title in himself, and thus release himself from liability to Snow. No court of equity would listen to such a claim. This is upon the assumption that Sherrill could have perfected title under the act of 1876, as Hardin claims to have done. But this we do not decide. We only say that if Sherrill had by a contract of purchase acquired Snow's equities in deeding his possession and his valuable improvements, and had then attempted to abandon the contract of purchase, ignoring his liability under it, and to acquire the title under the act of 1876, we should hold Snow's claim for purchase money good against the land in Sherrill's hands, even if he had obtained a patent in his own name under that act. In such a case he would have used the possession and other equities acquired from Snow to perfect his title, and he would have obtained for his own use the valuable improvements of the latter. It follows that, even in the most favorable view of the law for complainant, we must hold that Hardin took any interest he has in the land, subject to the claim of Snow under the bond. The complainant took a mortgage upon the land from Hardin to secure a debt. Hardin had at best but an equity, and his mortgagor is, therefore, not entitled to the protection extended by court of equity to *bona fide* purchasers without notice. This doctrine applies only to the purchaser of the legal title. Story, Eq. Jur. § 1502; *Vattier* v. *Hinds*, 7 Pet. 252; *Butler* v. *Douglass*, 1 McCrary, 630; [S. C. 3 FED. REP. 612.]

The conclusion is that Hardin acquired at the most only a right to the land after paying the balance due from Sherrill to Snow, and that the complainant stands in Hardin's shoes and can perfect his title, if at all, only upon the same condition. This conclusion accords with

our sense of justice and equity, since a contrary ruling would involve the injustice of depriving Snow of his possession, his improvements, his right to purchase at the minimum price, and all his equities and rights, without exacting that he shall be paid for them the sum agreed upon between him and Sherrill, to whom he sold and conveyed therein upon the condition that payment be made. As complainant has not tendered payment of the sum due defendant Snow upon the bond and notes for the purchase money, the bill is in our view bad, and the demurrer must be sustained upon this ground, without considering the other important and perhaps doubtful questions argued by counsel.